IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

The CIT Group/ Equipment Financing, Inc.,  )
                                          )
      Plaintiff,                  )
                                          )
      vs.                        )      Civil Action No. 9-432
                                          )
Krones, Inc., a Wisconsin corporation;   )
Krones Akktiengesellschaff, a German    )
corporation; Heinz Sommer; Volker       )
Kronseder; and Gregory Podlucky,      )
      Defendants.             )

AMBROSE, Chief District Judge

**OPINION**
**and**
**ORDER OF COURT**

**SYNOPSIS**

This lawsuit is one of several which stem from the demise of a beverage manufacturer.  Plaintiff, who arranged financing for the beverage manufacturer's construction of a bottling plant, contends that the beverage manufacturer and its equipment supplier conspired to defraud it of millions of dollars.  In general terms, the alleged fraud took the form of over-financing the equipment and remitting a large portion of the excess funds to the beverage manufacturer.  The Plaintiff contends that, but for the beverage manufacturer being forced into bankruptcy, the fraud would have continued in other forms.

Plaintiff has asserted civil conspiracy, civil RICO, fraud, negligent misrepresentation, fraudulent misrepresentation and failure to disclose, unjust enrichment and unlawful acts claims against the equipment supplier, its owners

and executives, and the chief executive officer of the beverage manufacturer. The equipment supplier and its executives and owners have filed a Motion to Dismiss all claims.  For the reasons set forth below, the Motion is denied in its entirety.  I will, however, hold in abeyance my ruling on the Motion insofar as it relates to the issue of personal jurisdiction over Volker Kronseder and permit limited jurisdictional discovery on this issue.

**OPINION**

### I. Factual Background[1]

Le-Nature's, Inc. ("Le-Nature's") manufactured non-carbonated beverages such as water and iced-teas.  It was head-quartered in Latrobe, Pennsylvania and run by Defendant Gregory Podlucky ("Podlucky"). Between 1998 and 2004 it allegedly experienced explosive growth.  That growth, which at the time was supported by audited financial statements, purportedly required the opening of a new four-line bottling plant in Phoenix, Arizona ("the Phoenix facility").  Le-Nature's retained the services of Defendants Krones, Inc and its parent company Krones Aktiengesellschaff ("Krones A.G.") (referred to collectively as "Krones") to provide and install the four lines of bottling equipment.  Krones' and Le-Nature's' working relationship was governed by a Project Management Agreement ("the PMA").  Le-Nature's and Krones signed the PMA in August of 2004.

---

[1] The Court recognizes that there are several related cases stemming from the demise of Le-Nature's, Inc. and that the facts alleged in each litigation differ. The facts set forth below are derived solely from the allegations set forth in this Complaint.

In the Fall of 2004, Le-Nature's approached Plaintiff CIT Group / Equipment Financing Inc. ("CIT") and Marshall Investments Corp. ("Marshall") and suggested that CIT and Marshall collaborate to arrange financing for the four bottling lines at the Phoenix facility.  Audited financial statements indicated that Le-Nature's had already deposited approximately $90 million with vendors related to the delivery of the equipment and both Le-Nature's and Krones representatives stated on several occasions that approximately $80 million of that amount was held by Krones as deposits on the Phoenix facility equipment. Consequently, CIT and Marshall agreed to arrange financing for three of the bottling lines.

The financing consisted of approximately $145 million and was structured as a lease ("the Leased Equipment").  In essence, CIT purchased[2] the Leased Equipment from Krones for $145 million.  It then leased the equipment to Le-Nature's for use at the Phoenix facility ("the Lease") and endeavored to sell interests in the Lease to various "Participants."  CIT was to serve as the administrative agent responsible for administration of the Lease under the terms of a participation agreement with the Participants.

In accordance with the financing,  Le-Nature's assigned to CIT certain rights and interests in the PMA.  Krones was aware of, consented to, and performed under, the PMA assignment ("the PMA Assignment").  Accordingly, Krones accepted payments from CIT, participated in meetings with CIT, directed invoices

---

[2]  Again, CIT and Marshall financed the purchase together, but as Marshall is not a party to this litigation, the Court will refer only to CIT.

to CIT and transferred title of the Leased Equipment to CIT.  In turn, CIT paid Krones directly for the Leased Equipment.

Prior to executing the PMA Assignment, CIT received what was represented to it to be a copy of the PMA executed between Le-Nature's and Krones.  The PMA identified the Leased Equipment being sold and reflected the total contract price for manufacture and installation of all four bottling lines as approximately $180 million.  By extrapolation, the three lines of Leased Equipment being purchased by CIT had a purchase price of approximately $145 million.

CIT contends that Le-Nature's and Krones, together with their employees and agents - including Defendants Podlucky of Le-Nature's, Heinz Sommer of Krones, Inc., and Volker Kronseder of Krones, Inc. and Krones A.G. - conspired to substantially over-finance the Leased Equipment.  Specifically, CIT alleges that the PMA it was shown was fraudulent and did not reflect the true purchase price of the Leased Equipment.  According to CIT, the actual PMA executed by Le-Nature's and Krones and kept secret from CIT and the Participants, had a stated purchase price of $90 million.

Additionally, CIT contends that the Defendants made repeated verbal and written representations that the inflated price was accurate.  CIT alleges that it received a call in March of 2005 from an individual who stated that CIT may have received false information regarding the purchase price of the Leased Equipment.  The caller indicated that the true cost of all the bottling equipment was approximately $90 million rather than $180 million.  The caller then faxed to

4

CIT in support of his allegations a two page spreadsheet ("the Tip Spreadsheet"). For each piece of equipment, the Tip Spreadsheet identified the configured list price, discounts and selling price to Le-Nature's.  A comparison of the information on the Tip Spreadsheet with the information given to CIT by Le-Nature's and Krones indicated that CIT was being asked to pay a significantly higher amount than Krones asked Le-Nature's to pay.

Over the course of the next several weeks, CIT sought to ascertain the true purchase price Le-Nature's had negotiated with Krones.  As more fully detailed below, various representatives from CIT had conversations with Heinz Sommer, Podlucky, Kronseder and Rainulf Diepold (Chief Financial Officer for Krones A.G.). Based upon these conversations, representations and supporting documentation, CIT believed that the $180 million figure was accurate and that the Tip Spreadsheet figures pertained to a facility which was proposed to be built in Las Vegas, but which had never been built.  Consequently, CIT paid $39 million in progress payments, mostly to Krones and  continued to market the sale of interests in the Lease to Participants.

Again, believing the Defendants' representations regarding the true cost of the Leased Equipment, CIT  attended the closing of the Phoenix Facility transaction on April 15, 2005 and executed all necessary paperwork.  Between April of 2005 and August of 2005, CIT paid Krones the remaining $100 million via wire transfers.  Payments were made following certifications from Le-Nature's that it had received the Leased Equipment from Krones.

A portion of some of these payments were designated as "Excess Funds" pursuant to an "Excess Funds Agreement" executed between Podlucky and Sommer.  Essentially, Podlucky had informed CIT that Le-Nature's had placed with Krones deposits on all of the bottling lines and wanted CIT to make the initial payments on the bottling lines to Le-Nature's as a refund of those amounts, rather than to Krones.  When CIT refused, the Defendants created the Excess Funds Agreement, whereby a portion of each wire transfer would be remitted by Krones to Le-Nature's.  CIT contends that the total amount paid by CIT to Krones, then paid by Krones to Le-Nature's purportedly as a return of deposits, approximated $60 million.  CIT urges that Le-Nature's never actually placed any deposits with Krones and that all Defendants understood that the refund of the alleged deposits was an integral part of the scheme of overcharging.

Once all the Leased Equipment was in place and CIT had completed all the wire transfers to Krones, Le-Nature's obligations to begin lease payments commenced.  This occurred in August of 2005.

Nevertheless, the fraud continued through 2006.  According to CIT, in 2006 representatives from Krones were working with Le-Nature's to dismantle one of the three bottling lines in the Phoenix Facility which had been financed by CIT.  Despite knowing that CIT had valid UCC filings with respect to the equipment, Krones answered inquires about the dismantling by explaining that the equipment was being transported to a new facility that Le-Nature's had constructed in the southeastern United States. CIT believes that the Defendants'

fraudulent conspiracy would have continued unabated except that a group of Le-Nature's unsecured creditors forced the company into an involuntary bankruptcy on November 1, 2006.

Having lost millions of dollars, CIT seeks recompense from the Defendants. As stated above, it asserts claims of civil conspiracy, civil RICO, fraud, negligent misrepresentation, fraudulent misrepresentation and failure to disclose, unjust enrichment and unlawful acts.  The Krones Defendants have filed a Motion to Dismiss (See Docket No. [39]) seeking the dismissal of all claims.  Specifically, the Krone Defendants contend that all of CIT's claims, which sound in fraud, must be dismissed for failure to comply with Federal Rule of Civil Procedure 9(b).  In the alternative, they allege that CIT's RICO, civil conspiracy and unjust enrichment claims are fatally flawed.  Finally, the Krones Defendants urge that Volker Kronseder is not subject to personal jurisdiction.

After careful review, and for the reasons set forth below, the Motion is denied.  I do, however, agree that Volker Kronseder is not subject to personal jurisdiction based upon the evidence of record, in Arizona.  However, I will permit CIT to engage in a limited period of discovery related to the issue of in personam jurisdiction against Kronseder.

**II. Standard of Review**

The Krones Defendants filed their motion to dismiss pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and 12(b)(6).  When deciding whether to grant or deny a 12(b)(6) motion the Supreme Court has held:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does
> not need detailed factual allegations, a plaintiff's obligation to
> provide the grounds of his entitlement to relief requires more than
> labels and conclusions, and a formulaic recitation of the elements of
> a cause of action will not do. Factual allegations must be enough to
> raise a right to relief above the speculative level, on the assumption
> that all the allegations in the complaint are true (even if doubtful in
> fact).

Bell Atlantic Co. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65,167 L.Ed.2d

929 (2007). (internal citations, footnotes and quotation marks omitted). See also,

Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (a plaintiff's factual

allegations must be enough to raise a right to relief above the speculative level).

Most recently, in Ashcroft v. Iqbal, ___ U.S.___, 129 S.Ct. 1937 (2009), the

Supreme Court held, ". . . a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face. A claim has

facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct

alleged." Iqbal, 129 S.Ct. at 1949 (citations and internal quotation marks omitted).

In Iqbal, the Court specifically highlighted the two principles which formed

the basis of the Twombly decision: First, for the purposes of a motion to dismiss,

courts must accept as true all factual allegations set forth in the complaint, but

courts are not bound to accept as true any legal conclusions couched as factual

allegations. Id. at 1949-1950. See also, Fowler v. UPMC Shadyside, ___ F.3d ___, No.

07-4285, 2009 WL 2501662 (3d. Cir. Aug. 18, 2009).  Second, a complaint will only

survive a motion to dismiss if it states a plausible claim for relief, which requires a

court to engage in a context-specific task, drawing on the court's judicial

8

experience and common sense. *Id.* at 1950.  Where well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but has not shown – the complainant is entitled to relief.

<u>Id.</u>, citing, F.R.Civ.P. 8(a)(2).

### III. Analysis

#### A. Compliance With Rule 9(b)[3]

The Krones Parties challenge the sufficiency of CIT's pleadings with respect

to the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b)

requires particularity when pleading fraud. <u>See</u> <u>Marangos v. Swett</u> Civ. No. 8-4146,

2009 WL 1803264 at * 3 (3d Cir. June 25, 2009).  Specifically, Rule 9(b) provides that:

> [i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

 Fed. R. Civ. P. 9(b).  "The purpose of Rule 9(b) is to provide notice of the 'precise

misconduct' with which the defendants are charged" in order to allow them the

opportunity to respond to the complaint "and to prevent false or

unsubstantiated charges." <u>Rolo v. City of Investing Co. Liquidating Trust</u>, 155 F.3d

644, 658 (3d Cir. 1998) *(abrogated on other grounds*, <u>Forbes v. Eagleson</u>, 228 F.3d

---

[3] I note that the Krones Defendants' Rule 9(b) challenge is very general in nature.  It consists of approximately two pages and references, in only two sentences, its main arguments - the "lumping of defendants" and the failure to identify the falsity of the representations.  Further, while the Krones Defendants urge that *all* of CIT's claims fail Rule 9(b)'s requirements, they do not identify in this section any deficiencies with respect to CIT's claims for civil RICO, unjust enrichment or unlawful acts.

471 (3d Cir. 2000)) *citing*, <u>Seville Indus. Machinery v. Southmost Machinery</u>, 742 F.2d 786, 791 (3d Cir. 1984).

Thus, to satisfy Rule 9(b), CIT must "plead with particularity the 'circumstances' of the alleged fraud." <u>Rolo</u>, 155 F.3d at 658.  CIT need not "plead the 'date, place or time' of the fraud, so long as [it] use[s] an 'alternative means of injecting precision and some measure of substantiation into [its] allegations of fraud." <u>Id</u>., *citing*, <u>Seville</u>, 742 F.2d at 791.  Further, I am cognizant that, where a party alleges a complex corporate fraud, much of the factual information necessary to describe the details of the fraud may be "peculiarly within the defendant's knowledge and control." <u>See</u> <u>Kaiser Foundation Health Plan, Inc. v. Medquist, Inc.</u>, Civ. No. 8-4376, 2009 WL 961426 at * 6 (D. N.J. April 8, 2009), *citing*, <u>In re Craftmatic Sec. Litig.</u>, 890 F.2d 628, 645 (3d Cir. 1989) and <u>Shapiro v. UJB Financial Corp.</u>, 964 F.2d 272, 284 (3d Cir. 1992).

The Krones Parties offer two brief criticisms of CIT's pleadings in light of Rule 9(b).  First, they complain that CIT "repeatedly lumps **all** 'Defendants,' including all of the Krones Parties and Podlucky, together." <u>See</u> Docket No. [41], p. 12 (emphasis in original).  Second, the Krones Parties contend that "CIT fails to allege what is false about each alleged representation and how or why each alleged representation was false at the time it was supposedly made." <u>Id</u>., p. 12-13.

Having carefully reviewed the Complaint, I find the criticisms to lack merit. Turning to the first argument, certainly there are some allegations in the

Complaint which provide general background information on the nature and goals of the alleged scheme and which do not delineate between the actions of particular Defendants. <u>See</u> Complaint, ¶1, 4, 5 and 8.  Tellingly, these paragraphs are all located in the "Introduction" section of the Complaint.  Had CIT included nothing more detailed as to each individual Defendants' alleged role, I would be inclined to agree with the Krones Defendants that the Complaint was deficient. <u>See</u> <u>Silverstein v. Percudani</u>, 422 F. Supp.2d 468, 473 (M.D. Pa. 2006) (stating, "[a] complaint that 'lumps' together numerous defendants does not provide sufficient notice of which defendants allegedly made the misrepresentations") and <u>Viacom Inc. v. Harbridge Merchant Services, Inc.</u>, 20 F.3d 771, 778 (7th Cir. 1994) (stating that, "[i]n a case involving multiple defendants, ... 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'").

Yet CIT's Complaint provides much more detail concerning the role which Sommer (individually and on behalf of Krones, Inc.), Kronseder[4] (on behalf of Krones, A.G. and possibly Krones, Inc.)[5], and others in the Krones, Inc. or Krones A.G. employ, played in the fraudulent scheme.  For instance, Sommer is charged with having denied, on or about  March 18, 2005,that $90 million was the total

---

[4] As discussed below, this Court cannot exercise *in personam* jurisdiction over Kronseder.  Consequently, any ruling pertaining to the sufficiency of the pleadings pursuant to Rule 9(b) does not apply to claims asserted against Kronseder in his personal capacity.

[5] As the titular heads of Krones, Inc. and Krones A.G., and because no argument has been raised to the contrary, I view the allegations against Sommer and Kronseder to constitute allegations against them both in the individual and corporate capacities.

cost of the Phoenix facility. <u>See</u> Complaint, ¶ 56.  When confronted with the "Tip

Spreadsheet" provided by an alleged insider which purported to show the

differences in actual prices charged by Krones and the prices Le-Nature's claimed

it was being charged, Sommer denied that the pricing did in fact relate to the

Phoenix facility. <u>Id</u>., ¶ 57.  Indeed, Sommer represented that the pricing figures

related to a facility that was proposed to be, but never actually was, built in Las

Vegas. <u>Id</u>., ¶¶ 57 and 70.  Again, shortly after March 24, 2005, during the course of

a telephone call, Sommer confirmed that the total purchase price for the Leased

Equipment associated with the Phoenix facility was approximately $185 million

and that the purchase price included a mark-up over the amount Krones A.G.

charged Krones, Inc. <u>Id</u>., ¶ 67.[6]  Sommer also falsely stated, during a telephone call

on March 24, 2005 with Roy Keller, President of CIT, that he helped compile the

information on the specification sheets and that the sheets were accurate and

that Krones had not paid any of the $11.5 million down payment it received from

Le-Nature's for the Leased Equipment back to Le-Nature's. <u>Id</u>., ¶ 67.  In fact, Krones

had repaid to Le-Nature's approximately $5 million of the down payment. <u>Id</u>.

CIT charges Rainulf Diepold, Chief Financial Officer for Krones A.G., with

having signed specification sheets which identified each piece of equipment

---

[6] Given this specific allegation, I find unconvincing the Krones Defendants'
contentions that CIT had to make specific allegations concerning Sommers' or
Kronseders' role in providing a fraudulent PMA. <u>See</u> Reply Brief, p. 1-2.  In
paragraph 67 of the Complaint, CIT specifically alleges that Sommer confirmed
what CIT understood from the allegedly fraudulent PMA to be the price of the
Leased Equipment and confirmed that he helped compile and signed the
associated specification sheets.

being provided with respect to the four bottling lines at the Phoenix facility.  The specification sheets contained a purchase price identical to the inflated price set forth in the fraudulent PMA. Id., ¶ 69.  On or about March 29, 2005, Diepold confirmed the accuracy of the specification sheets during a telephone call with Tom Magrath of CIT. Id, ¶ 71.

CIT alleges that, during a March 24, 2005 telephone call with Roy Keller, President of CIT, Kronseder confirmed that Krones, A.G. had already shipped over $100 million of equipment to the United States for installation at the Phoenix facility. Id, ¶ 65.  Kronseder explained that this figure represented the price being charged to Krones, Inc and not the price being charged to Le-Nature's. Id. Kronseder made these representations after having been informed that Le-Nature's was seeking to double finance the Leased Equipment and was misrepresenting to the financial community that Le-Nature's had deposited approximately $80 million toward the cost of the Leased Equipment. Id, ¶ 82. Indeed, CIT alleges that even armed with this knowledge, Kronseder continued to vouch for the accuracy of the Le-Nature's transaction. Id.

CIT also includes numerous allegations directed solely toward "Krones." See Complaint, ¶¶ 26, 32, 82(l), 83, 84, 85 and 86.   While these allegations do not distinguish between Krones, A.G. and Krones, Inc., it appears from the Complaint that CIT's theory is that any corporate distinction between the companies is legally meaningless.[7]  CIT identifies Krones, Inc. as a "wholly-owned and controlled

---

[7] The legal plausibility of this theory is not before me.

13

subsidiary" of Krones, Inc. Id, ¶ 17.   Further, paragraphs 26 and 32, while they speak generally of "Krones," do refer to other paragraphs which identify, in detail, "the identity of the speaker, the target and the content of the alleged statement." See Indianapolis Life Ins. Co. v. Hentz, Civ. No. 6-2152, 2008 WL 4453223 at * 11(M.D. Pa. Sept. 30, 2008).

Consequently, as evidenced by the sampling of allegations set forth above, I reject the Krones Defendants' contention that CIT's fraud claims are deficient because they "repeatedly lump" all Defendants, including Podlucky, together. The Complaint contains sufficient detail concerning the role of each defendant to pass muster under Rule 9(b).

I find similarly unconvincing the Krones Defendants' other contention - that CIT failed to identify what was "false" about the representations set forth above.  The Complaint clearly explains that the true purchase price of the Leased Equipment negotiated between Le-Nature's and the Krones Parties was approximately $90 million. See Complaint, ¶ 3.  Each statement identified above to the contrary (e.g., ¶¶ 56, 67) therefore was necessarily false.  Additionally, CIT further avers that it ultimately learned that Le-Nature's had not made *any* deposits towards the payment of the four bottling lines. Id., ¶ 80.  Again, any statement made to the contrary (e.g., ¶ 67) was necessarily false.  CIT also contends that the Tip Spreadsheet accurately reflected the costs of the bottling equipment at the Phoenix facility.  Any statements to the contrary, particularly those suggesting that the Tip Spreadsheet related to a facility that was proposed

14

for Las Vegas (e.g., ¶¶ 57, 70) was necessarily false.

In sum, I find that the Complaint establishes in substantively sufficient detail, the circumstances constituting fraud.  Though not required, in most instances CIT has identified the date, time and place of the fraudulent acts as well as the individual committing the fraud and the individual to whom the fraudulent statements were conveyed.  I am convinced therefore that the Complaint is drafted in compliance with Rule 9(b) and that the Krone Defendants have notice of the precise misconduct with which they are charged so as to allow them the opportunity to respond to the Complaint and to prevent the filing of false or unsubstantiated charges.  Accordingly, the Motion to Dismiss is denied.

B. RICO[8]        CIT also asserts civil RICO claims arising both under federal and Arizona law.[9]  Essentially, CIT contends that Krones, Inc., Krones A.G., Sommer, Kronseder, Podlucky and Le-Nature's engaged in a scheme to defraud CIT beginning in 2004 and continuing through October of 2006.  The Complaint sets forth over 25 predicate acts of racketeering activity consisting chiefly of mail and wire fraud.

_____

[8] As discussed below, this Court cannot exercise in personam jurisdiction over Kronseder.  Consequently, any ruling pertaining to the sufficiency of the pleadings pursuant to RICO does not apply to claims asserted against Kronseder in his personal capacity.

[9] An Arizona RICO claim is analogous to its federal counterpart. See Castro v. Executive Tr. Servs., Civ. No. 8-2156, 2009 WL 438683 at * 8 (D. Ariz. Feb. 23, 2009) and State v. White, 2008 WL 4069306 at * 9 (Ariz. App. Div. 2, Sept. 3, 2008). Consequently, I will analyze the claims together.  Further, to the extent that the Krones Defendants attack the viability of the Arizona RICO claim in a footnote, I decline to address such an argument as insufficiently developed.

A RICO claim under 18 U.S.C. § 1962(c) consists of four basic elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) and Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004).  The Krones Defendants challenge the sufficiency of CIT's pleadings with respect to the existence of an enterprise and a pattern of predicate acts.  Guided by Iqbal, and for the reasons set forth below, I find that CIT's pleadings are sufficient with respect to these elements.

(1) An "Enterprise"

Under RICO, an enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  It is a "group of persons associated together for a common purpose of engaging in a course of conduct.'" United States v. Turkette, 452 U.S. 576, 583, 101 S. Ct. 2524 (1981).  "RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle v. United States, __ U.S. __, 129 S. Ct. 2237, 2243 (June 8, 2009), citing, Turkette, 452 U.S. at 583.

In Seville Indus. Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 790 (3d Cir. 1984), the Third Circuit court rejected the very argument that the Krones Defendants advance here; that is, that a plaintiff need plead that an enterprise is an ongoing organization with some sort of framework or superstructure for carrying out decisions, that the members of the enterprise function as a continuing unit with established duties and that the enterprise is

16

separate and apart from the pattern of activities in which it engages. While the court acknowledged that such *evidence* might be required at *trial* to prove the existence of an enterprise, the court emphasized that notice pleading under the Federal Rules of Civil Procedure require nothing more than simply identifying the enterprises. <u>Seville</u>, 742 F.2d at 790.

The Krones Defendants urge that the <u>Seville</u> standard is inapplicable where the enterprise is an "association in fact."  I agree that several courts, including a colleague in this District, have reached such a conclusion. <u>See</u> <u>In re American Investors Life Ins. Co. v. Annunity Mktg and Sales Practices</u>, MDL 1712, 2006 WL 1531152 at * 9 (E.D. Pa. June 2, 2006) (finding <u>Seville</u> inapplicable where the relevant enterprise is an association in fact),[10] and <u>McCullough v. Zimmer, Inc.</u>, Civ. No. 8-1123, 2009 WL 775402 at * 12 (W.D. Pa. March 18, 2009).  Significantly, however, the Krones Defendants failed to identify any Third Circuit court decision suggesting that <u>Seville</u> is no longer good law.  The allegations in the Complaint sufficiently identify the existence of a RICO enterprise under that standard. <u>See</u> Complaint, ¶ 101.

Yet I will presume, for purposes of this Motion, that the Krones Defendants are correct, and CIT must plead "structural features" because it has asserted an association in fact enterprise.  The Krones Defendants urge that CIT's Complaint is

---

[10] I find the Krones Defendants' reliance on the <u>Boyle</u> decision for the proposition that a plaintiff must plead structural features related to an association in fact enterprise to be misplaced.  The <u>Boyle</u> court addressed the inadequacy of a jury instruction, not a pleading.

17

deficient in meeting this pleading requirement because "[n]owhere in the Complaint does CIT describe a unified 'organization' comprised of Podlucky, Kronseder, Sommer, Krones AG, and Krones Inc., even in conclusory terms." See Docket No. [41], p. 26.  They add that "the sporadic acts of entities and individuals on two continents within the space of a few months" fails to demonstrate that the enterprise functioned as a "continuing unit to achieve a common purpose" or "longevity of activity." Id.  I reject both contentions.

First, the Complaint adequately alleges that the enterprise functioned on a consensual basis, that the individuals and corporate entities acted in concert and for the common purpose of accomplishing the massive fraudulent scheme. CIT explains how the parties colluded, why they colluded and to what end. See, e.g., Complaint, ¶¶ 4-7, 58-63, 64-66, 67-72, 82(a)-(j)   Significantly, here the conspirators are not competitors.  Their relationship is symbiotic. Further, the individuals and entities are not widely disparate.  They consist of corporations and their employees and corporations related to each other.  Finally, the parties were contractually bound to each other. See Complaint, ¶ 25.  This permits an inference that the entities were working together rather than at odds, as competitors would.

Second, contrary to the Krones Defendants' suggestions, the allegations in the Complaint consist of acts covering more than a few months.  CIT complains of a fraud begun at least in August of 2004 when Le-Nature's and the Krones Defendants signed the PMA and continuing through October of 2006 - when

18

LeNature's was forced into bankruptcy. <u>See</u> Complaint, ¶ 105.  Indeed, the predicate acts alone detail actions begun in April of 2005 and carried on through October of 2006. <u>See</u> Complaint, ¶108.  A period of 18 months can hardly be characterized as "a few months."

Consequently, under the <u>Iqbal</u> standard, I find that, whether using <u>Seville</u> or the <u>In re American Investors</u> pleading requirements, CIT has sufficiently alleged the existence of an "enterprise."

(2) A "Pattern"

The RICO statute defines a "pattern" of racketeering activity as requiring "at least two acts of racketeering activity within a ten year period." <u>See</u> 18 U.S.C. §1961(5).  Arizona law requires that at least two acts occur within five years. <u>See</u> Ariz. Rev. Stat. § 13-2314.04(S)(3)(a)(I).  The pattern must consist of something "beyond simply the number of predicate acts involved."   <u>H.J. Inc. v. Northwestern Bell Telephone Co.</u>, 492 U.S. 229, 238, 109 S. Ct. 2893, 2900 (1989). Additionally, the required showing of a pattern applies with respect to the role of each defendant. <u>See</u> <u>DeFalco v. Bernas</u>, 244 F.3d 286, 306 (2d Cir. 2001).

Further, the RICO statute contemplates that the RICO scheme has a "continuity" to it.  As the Krones Defendants argue, "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."(citations omitted). <u>H.J. Inc.</u>, 492 U.S. at 241, 109 S. Ct. at 2902. "A party alleging a RICO violation may demonstrate continuity over a closed

19

period by proving a series of related predicates extending over a substantial period of time." Id., at 242.  The Third Circuit has suggested that the fraudulent conduct must last at least one year to satisfy the "continuity" requirement of a closed-ended concept. See Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 611 (3d Cir. 1991) (citations omitted).  In contrast, where a closed period of repeated conduct has not been established, a party may demonstrate a "threat of continuity."  "A threat of continuity exists when the predicate acts are a part of the defendant's 'regular way of doing business.'" Hughes, 945 F.2d at 610.

The Krones Defendants challenge the sufficiency of the allegations in the Complaint concerning the number of predicate acts alleged as to each Krone Defendant as well as the allegations concerning the concept of "continuity." After careful consideration, however, and keeping in mind the Iqbal standard, I reject the Krones Defendants' contentions.  As to the "pattern" requirements, the Complaint sets forth ample allegations of a pattern as to Sommer (see Complaint, ¶¶108 -  RICO Acts 18 and 20); Krones, Inc. (see Complaint, ¶¶ 108 - RICO Acts 1 - 9; 17; 21; 22; 24; 25) and Krones A.G. (see Complaint ¶¶ 33, 71 ).[11]

---

[11] CIT urges that, in addition to the predicate acts identified above, each Krones Defendant is individually accountable for all acts of the mail and wire fraud.  According to CIT, conspiracy principles apply and a defendant may be liable where he or she acts "with the knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." United States v. Pereira, 347 U.S. 1, 8-9 (1954) and United States v. Bentz, 21 F.3d 37, 40 (3d Cir. 1994).  CIT urges that the Complaint establishes that all of the Krones Defendants either knew that the use of mails or wires was occurring, would follow in the ordinary course of business, or that such use was reasonably foreseeable in furtherance of the scheme to defraud.  Accordingly, each Defendant should be held culpable for the

As to "continuity," CIT contends that the allegations in the Complaint establish both a closed-ended and an open-ended concept.  With respect to a closed-ended concept of continuity, the Complaint details a fraudulent scheme that began at least in 2004, when the Krones Defendants and Le-Nature's and Podlucky signed a PMA for the purchase of four lines of bottling equipment, knowing that the actual cost of the Leased Equipment was approximately half the amount that both the Krones Defendants and Le-Nature's (and Podlucky) represented to the financial market and CIT the true cost was.  The fraudulent scheme continued through October of 2006 and ended only when Le-Nature's was involuntarily forced into bankruptcy. See Complaint, passim.  This exceeds the one year threshold. See Hughes, 945 F.2d at 611.

As to the open-ended concept of continuity, I find that the allegations in the Complaint show "that the predicates are a regular way of conducting the defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" Tabas v. Tabas, 47 F.3d 1280, 1295 (3d Cir. 1995) (citations omitted).  The Complaint contains allegations suggesting that, but for the involuntary bankruptcy which halted the fraudulent conspiracy, Le-Nature's, Podlucky and the Krones Defendants were embarking upon another effort to defraud CIT of further funds.  Specifically, at the time of the bankruptcy, the Krones Defendants and Podlucky were working to induce CIT to

---

various acts of mail or wire fraud committed by others throughout the course of the racketeering scheme.  The Krones Defendants offer no response to this argument.

raise an additional $180 million to fund a fictitious plant in the southeastern

United States. <u>See</u> Complaint, ¶¶ 85-86.  Further, the Krones Defendants and

Podlucky were actively dismantling and removing an entire line of bottling

equipment owned by CIT and located at the Phoenix Facility, without CIT's

knowledge or consent. <u>Id</u>., ¶¶ 83-83.  When questioned about its actions, the

Krones Defendants lied, stating that the equipment was being moved to a Le-

Nature's plan in the southeastern United States which it knew did not exist. <u>Id</u>.  I

think it a fair inference from these allegations that the Defendants' racketeering

activity would have continued unabated.  Consequently, the Motion to Dismiss is

denied as to the RICO claim.                  C. Civil Conspiracy[12]

CIT sets forth a claim under Arizona law for "civil conspiracy."  Specifically,

CIT contends that the Defendants entered into an agreement with Le-Nature's: to

defraud financial institutions by securing financing for Leased Equipment for

amounts far in excess of the Leased Equipment's true purchase price; to induce

those financial institutions to purchase the Leased Equipment at the inflated

prices; to divert funds to Le-Nature's that were paid to the Krones Defendants by

financial institutions with the knowledge and cooperation of Krones; and to

maintain the fraudulent enterprise by using the diverted and improperly

obtained funds to mask Le-Nature's true financial condition and enrich the

---

[12] As discussed below, this Court cannot exercise *in personam* jurisdiction over Kronseder.  Consequently, any ruling pertaining to the sufficiency of the pleadings pursuant to civil conspiracy does not apply to claims asserted against Kronseder in his personal capacity.

conspirators. See Complaint, ¶ 93.  The Krones Defendants challenge the sufficiency of the pleadings under Iqbal.

Significantly, CIT need not plead an express agreement.  Rather, "for a plaintiff to prevail on a civil conspiracy claim, there must be at least a tacit understanding." In re Sunset Bay Associates, 944 F.2d 1503, 1517 (9th Cir. 1991) (citations omitted).  "The existence of a conspiracy may sometimes be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." Southern Union Co. v. Southwest Gas Corp., 165 F. Supp.2d 1010, 1021 (D. Ariz. 2001), citing, In re Sunset Bay Associates, 944 F.2d 1503, 1517 (9th Cir. 1991) (internal quotation marks omitted).   Having reviewed the allegations, I reject the Defendants' contentions that "CIT fails to allege any facts supporting the inference that any Krones Party and any other defendant entered into an agreement to commit any unlawful act (much less an unlawful agreement among them all)." See Docket No. [41], p. 25. See Complaint, ¶93 (outlining the nature of the conspiracy), ¶ 35 (Krones' and Le-Nature's signatures on the fraudulent PMA which was given to CIT to induce it to provide financing); ¶ 33-34 (assignment of the fraudulent PMA from Le-Nature's to CIT and Krones' resulting performance thereunder); ¶¶ 47-73 (Podlucky's and Sommers' fraudulent denials of accuracy of Tip Spreadsheet and fabrication of specification sheets intended to justify cost of Leased Equipment); ¶ 65 (Kronseder stating that Krones AG had already shipped over $100 million worth of equipment); ¶¶ 74-80 (the Krones Defendants' and Podlucky's fraudulent

representations that the "Excess Funds" represented a repayment of deposits Le-Nature's had made on the Leased Equipment); and ¶¶ 83-85 (the Krones Defendants' and Podlucky's agreement to deprive CIT of its UCC interests in the Leased Equipment by removing it from the Phoenix Facility for transportation to a facility as yet to be built in the southeastern United States). The Court may infer the existence of a conspiracy from the nature of the acts set forth in these allegations, from the relation of the parties as set forth in these allegations and from the interests of these alleged conspirators.  Consequently, the Motion to Dismiss the Civil Conspiracy claim is denied.

D. Unjust Enrichment[13]

In Count VI, CIT sets forth a claim for unjust enrichment.  The parties both rely upon Arizona law as supplying the following elements for a cause of action for unjust enrichment:

(1) an enrichment to the defendant;

(2) an impoverishment to the plaintiff;

(3) a connection between the alleged enrichment and the impoverishment;

(4) an absence of justification for the enrichment; and

(5) an absence of an adequate remedy at law.

---

[13] As discussed below, this Court cannot exercise *in personam* jurisdiction over Kronseder.  Consequently, any ruling pertaining to the sufficiency of the pleadings pursuant to unjust enrichment does not apply to claims asserted against Kronseder in his personal capacity.

See Docket No. [43], p. 28-29 and Docket No. [41], p. 28; see also, Trustmark Ins. Co.
v. Bank One, Arizona, NA, 202 Ariz. 535, 541, 48 P.3d 485, 491 (2002), citing City of
Sierra Vista v. Cochise Enter., Inc., 144 Ariz. 375, 381, 697 P.2d 1125, 1131
(App.1984).

　　　The Krones Defendants attack the sufficiency of CIT's pleadings with
respect to the first, third and fifth elements.  A careful review of the Complaint
convinces me that CIT satisfies the pleading standards.  With respect to the first
element,  though the Krones Defendants would couch the alleged enrichment in
terms of a vague "ability to sell" equipment to LeNature's, the Complaint itself
contains very concrete allegations regarding the retention of millions of dollars.
Specifically, CIT contends that it "paid in excess of $74 million more than the true
cost of the equipment... ." See Complaint, ¶ 1.  CIT further alleges that it made the
payments for the Leased Equipment to the Krones Defendants. Id., ¶ 34.  Further,
though the Krones Defendants are correct that CIT acknowledges that all
payments designated "Excess Funds" were remitted by the Krones Defendants to
LeNature's, the Excess Funds accounted for only $60 million. Id., ¶ 79.
Accordingly, the Krones Defendants unjustly retained approximately $14 million
in funds over and above the true cost of the Leased Equipment.  These
allegations satisfy the requirement that CIT aver that it conferred a cognizable
benefit upon the Krones Defendants.

　　　Additionally, with respect to the third element, contrary to the Krones
Defendants' suggestions, the connection between the conferred benefit and the

sustained loss is obvious.  CIT overpaid by $74 million the true cost of the Leased Equipment.  The Krones Defendants retained $14 million of that overpayment.

Finally, the Krones Defendants' "adequate remedy at law" argument is a red herring.  Whether CIT has other viable legal theories of recovery, such as RICO, is irrelevant to the viability of an unjust enrichment claim.  The "adequate remedy at law" element of an unjust enrichment claim is designed to determine whether the parties' relationship is governed by a contract. See Trustmark, 48 P.3d at 492 (stating that "if there is 'a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'") (citations omitted).  Here, it is evident from the allegations in the Complaint, and indeed the Krones Defendants do not dispute, that CIT did not contract directly with the Krones Defendants.

Accordingly, I find that CIT has adequately stated a claim against the Krones Defendants for unjust enrichment.  The Motion to Dismiss is therefore denied in this regard.

E. Rule 12(b)(2) Challenge - Personal Jurisdiction Over Volker Kronseder

CIT asserts federal and Arizona state law claims against Kronseder. Kronseder counters that this Court lacks the requisite personal jurisdiction over him necessary to entertain these claims.  Accordingly, he demands the dismissal of all claims asserted against him pursuant to Federal Rule of Civil Procedure 12(b)(2).

26

"'Because federal courts are courts of limited jurisdiction, a presumption arises that they are without jurisdiction until the contrary affirmatively appears.'" Donaldson v. Informatica Corp., Civ. No. 8-605, 2009 WL 483087 at * 7 (W.D. Pa. Feb. 25, 2009), *citing*, Myers v. Am. Dental Ass'n, 695 F.2d 716, 724 (3d Cir. 1982). "'The person asserting jurisdiction bears the burden of showing that the case is properly before the court at all stages of the litigation.'" Donaldson, 2009 WL 483087 at * 7, *citing*, Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1045 (3d Cir. 1993). In other words, "once the defendant raises the question of personal jurisdiction, the plaintiff bears the burden to prove, by a preponderance of the evidence, facts sufficient to establish personal jurisdiction." Cateret Sav. Bank, FA v. Shushan, 954 F.2d 141, 146 (3d Cir. 1992). "When a defendant challenges personal jurisdiction, the plaintiff has the burden of proof to establish 'jurisdictional facts through sworn affidavits or other competent evidence.' Regan v. Loewenstein, 292 Fed. Appx. 200, (3d Cir. 2008), *quoting* Patterson by Patterson v. F.B.I., 893 F.2d 595, 604 (3d Cir.1990).[14]        CIT, as Plaintiff, thus bears the burden of proving the existence of personal jurisdiction. Further, because CIT initiated this action in the District of Arizona, before it was transferred here pursuant to 28 U.S.C. § 1407, the jurisdictional queries must be answered with respect to the District of Arizona. Consequently, I may only

---

[14] "For purposes of a Rule 12(b)(2) motion, the court applies the same standard for truthfulness and inferences as in a Rule 12(b)(6) motion, that is, accepting as true plaintiff's version of the facts and drawing all inferences in the plaintiff's favor." Id., *citing*, Marten v. Godwin, 499 F.3d 290, 295 n. 2 (3d Cir. 2007).

exercise personal jurisdiction over Kronseder to the same extent that the District Court in Arizona could have.  See In re Latex Gloves Products Liability Litigation, MDL No. 1148, 2001 WL 964105 at * 2 (E.D. Pa. Aug. 22, 2001), citing, In re Teletronics Pacing Sys., Inc., 953 F. Supp. 909, 913 (S.D. Ohio 1997) and In re Agent Orange Prod. Liability Litig., 818 F.2d 145, 163 (2d Cir. 1987).  As does Pennsylvania's, Arizona's "long-arm rule permits the exercise of personal jurisdiction to the extent allowed by the due process clause of the United States Constitution." Ochoa v. J.B. Martin and Sons Farms, Inc., 287 F.3d 1182, 1188 (9th Cir. 2002), citing, Ariz. R. Civ. P. 4(e)(2).

The Due Process Clause permits courts to exercise two types of personal jurisdiction over a defendant -  general and specific.  See Mellon Bank (East) PSFS, Nat'l Assn. v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992).  General jurisdiction is the broader of the two types, and is supported where a defendant has maintained "systematic and continuous" contacts with the forum state.  See  Donaldson, 2009 WL 483087 at * 7, citing, Marten v. Godwin, 499 F.3d 290, 296 (3d Cir. 2007).  The contacts need not be related to the particular claim proceeding in court.  Thus, "[i]f general jurisdiction exists, a court may exercise jurisdiction over a non-resident defendant as to any claim against [him], regardless of whether the subject matter of the cause of action has any connection to the forum."  Mellon Bank, 960 F.2d at 1221. "Conversely, specific jurisdiction 'is present only if the plaintiff's cause of action arises out of a defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in

28

that forum.'" <u>Remick v. Manfredy</u>, 238 F.3d 248, 255 (3d Cir. 2001).  Specific jurisdiction is a narrower grant of jurisdiction.

 Kronseder has tendered a Declaration which would defeat any effort to establish the exercise of general jurisdiction.[15]   Accordingly, CIT focuses its argument upon specific jurisdiction.  It utilizes two different methods to establish specific jurisdiction - the more traditional minimum contacts method and the alternative "effects" test.  After careful consideration, I reject CIT's contentions that the evidence of record establishes that the exercise of specific jurisdiction would be appropriate here.

  (1) Traditional Inquiry

 "Traditionally, determining whether specific jurisdiction exists over a non-resident defendant involves a three part inquiry." <u>Donaldson</u>, 2009 WL 483087at * 8 *citing*, <u>Marten</u>, 499 F.3d at 296.  CIT must show: (1) that Kronseder "purposefully directed" his activities at Arizona; (2) that the claim "arises out of or relates to" at least one of those specific activities; and (3) that the exercise of jurisdiction comports with "fair play and substantial justice." <u>Id</u>.  CIT fails to satisfy the first of the inquiries.

 As "evidence" that Kronseder purposefully directed his activities toward

---

[15]  For example, Kronseder explains that he resides in Germany, not Arizona. He has never been registered to vote in Arizona nor owned real estate in Arizona. He has never had bank accounts in Arizona, never applied for a license, permit or registration in Arizona, nor visited Arizona. <u>See</u> Docket No. [40-2].  In light of this uncontradicted evidence, Kronseder can hardly be said to have had "systematic and continuous" contacts with Arizona.

Arizona, CIT offers the following:

• Kronseder attended an industry trade show in Chicago where he was informed that LeNature's was misrepresenting to the financial markets the cost of the Leased Equipment;

• Kronseder hosted a dinner honoring Podlucky and LeNature's following the trade show in Chicago;

• At the dinner, Kronseder instructed his employees not to discuss with CIT employees the deal between Krones and LeNature's; and

• A single telephone call occurred between Kronseder in Germany and Roy Keller of CIT, then located in Arizona.[16]

See Docket No. [43], p. 30-32.  One can hardly conclude that Kronseder's attendance at a trade show and dinner party in *Chicago* somehow constitutes action purposefully directed toward *Arizona*.  With respect to the phone call, CIT urges that "[t]his call alone is sufficient for personal jurisdiction." See Docket No. [43], p. 32, *citing*, Zippo Manufacturing Company v. Zippo Dot Com, Inc., 952 F. Supp. 1119, 1127 (W.D. Pa. 1997).  I agree that the Supreme Court has made it clear that even a single contact *can* be sufficient to demonstrate that a defendant purposefully established contacts with a forum state. See McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223, 78 S. Ct. 199, 201 (1957).  Yet, "[t]he test has always focused on the 'nature and quality' of the contacts with the forum and not the quantity

---

[16] Kronseder denies knowing that the phone call was with someone in Arizona.

of those contacts." Zippo, 952 F. Supp. at 1127, *citing*, International Shoe Co. V. Washington, 326 U.S. 310, 320, 66 S. Ct. 154, 160 (1945). Here, the "nature and quality" of the contacts - a single telephone call- does not convince me that Kronseder purposefully established contacts with Arizona. Indeed, CIT failed to identify any case law in which a court exercised specific jurisdiction based upon a single phone call.[17] I decline to find that Kronseder purposefully directed his activities toward Arizona based upon this paucity of evidence.

        (2) Effects Test

In Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482 (1984), the Supreme Court announced an alternative means of establishing personal jurisdiction in intentional tort cases. Commonly referred to as the "effects test," a plaintiff may establish specific jurisdiction over a non-resident defendant if he demonstrates: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be

---

[17] CIT also urges that, as director of Krones, Inc. - the sales arm of Krones AG in the United States, Kronseder is involved in the marketing and sales operations in the United States. See Docket No. [43], p. 37-38. CIT then asks this Court to infer that Kronseder surely must have known of and approved and participated in the sale of equipment to the Phoenix facility. Id. I decline to make such an inference, however. There is no evidence before me indicating that Kronseder was involved in the sale to LeNature's or CIT. Indeed, the only evidence before me concerning Kronseder's role with respect to Krones, Inc. is that he is a member of the board. See Docket No. [40-2]. I certainly do not deny the possibility of CIT's assertions, but a jurisdictional ruling must be made upon evidence.

said to be the focal point of the tortious activity. See Marten v. Godwin, 499 F.3d 290, 297 (3d Cir. 2007). Where a plaintiff establishes these three elements, he "can demonstrate a court's jurisdiction over a defendant even when the defendant's contacts with the forum alone ... are far too small to comport with the requirements of due process under [the] traditional analysis." Marten, 499 F.3d at 297, citing, IMO Industries, Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998) (internal quotation marks omitted). Nevertheless, the effects test "prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state." Id.

Turning to the third inquiry, as above, the evidence before me does not establish that Kronseder "expressly aimed" his conduct at Arizona. The evidence consists of a single phone call. Further, with respect to the second inquiry, CIT can hardly argue that it "felt the brunt of the harm" in Arizona. By its own admissions it is incorporated under the laws of the State of Delaware and has its principal place of business in New Jersey. See Complaint, ¶ 9. Any financial repercussions of Kronseder's actions would have been "felt" there. Consequently, the exercise of personal jurisdiction under the "effects test" is similarly unwarranted.

(3) Jurisdictional Discovery

In the alternative, CIT requests leave to conduct jurisdictional discovery in lieu of dismissing the claims against Kronseder. "[Where the plaintiff's claim is

32

not clearly frivolous, the court should ordinarily allow jurisdictional discovery in order to aid the plaintiff" in his attempt to establish jurisdiction. See Reading v. Sandals Resorts Int'l. Ltd., Civ. No. 6-3511, 2007 WL 952031 at * 3 (D. N.J. March 28, 2007), citing, Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances, 723 F.2d 357, 362 (3d Cir. 1983) and Massachusetts School of Law of Ander, Inc. v. American Bar Ass'n., 107 F.3d 1026, 1042 (3d Cir. 1997) (holding that the general rule is that jurisdictional discovery should be allowed unless the plaintiff's claim is "clearly frivolous").  Thus, "[i]f a plaintiff can present factual allegations that suggest 'with a reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' the plaintiff should have a right to conduct jurisdictional discovery." Reading, 2007 WL 952031 at * 3, citing, Toys "R" Us, Inc. v. Step Two S.A., 318 F.3d 446, 456 (3d Cir. 2003) and Mellon Bank (East) PSFS, Nat. Ass'n. v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992).  However, "jurisdictional discovery generally relates to corporate defendants and the question of whether they are 'doing business' in the state." Massachusetts School of Law, 107 F.3d at 1042, citing, Compagnie Des Bauxites, 723 F.3d at 362. "'Where the defendant is an individual, the presumption in favor of discovery is reduced." Id., citing, Shaw v. Boyd, 658 F. Supp. 89, 91 n. 1 (E.D. Pa. 1987).

I recognize that Kronseder is an individual and the presumption in favor of discovery is thus reduced in this instance.  Nevertheless, given the circumstances of this case, I am inclined to permit limited jurisdictional discovery.  Though Kronseder urges that CIT has had ample time to gather evidence of Kronseder's

contacts with Arizona, given that LeNature's filed for bankruptcy nearly three years ago, there is no suggestion that CIT has been permitted to engage in jurisdictional discovery.  Further, while Kronseder's declaration refutes the possibility that general jurisdiction would exist in this case, the declaration does not negate the possibility that specific jurisdiction might not arise.  Clearly Kronseder is involved with both Krones A.G. and Krones, Inc.  Further, it appears at this juncture that bottling equipment manufactured by Krones A.G. and sold to LeNature's through Krones, Inc. was supplied to the Phoenix facility. Kronseder's specific role and / or duties in this sale may prove to support the exercise of personal jurisdiction.  Consequently, I will permit CIT to engage in limited discovery in this regard.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| The CIT Group/ Equipment Financing, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 9-432 |
| | ) | |
| Krones, Inc., a Wisconsin corporation; | ) | |
| Krones Akktiengesellschaff, a German | ) | |
| corporation; Heinz Sommer; Volker | ) | |
| Kronseder; and Gregory Podlucky, | ) | |
| | ) | |
| Defendants. | ) | |

AMBROSE, Chief District Judge

**ORDER OF COURT**

AND NOW, this 16th day of September, 2009, after careful consideration, and for the reasons set forth in the accompanying Opinion, the Motion to Dismiss (Docket No. [39]) is denied in its entirety.  I will, however, hold in abeyance my ruling on the exercise of personal jurisdiction of Volker Kronseder (and accordingly all claims asserted against Kronseder in his individual capacity) pending limited discovery on this issue.

The parties are permitted a period of sixty days of discovery on this issue of personal jurisdiction.  Discovery on this topic shall close on November 18, 2009.

BY THE COURT:

/s/  Donetta W. Ambrose
Donetta W. Ambrose
Chief U.S. District Judge